# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| | |
|---|---|
| ALVIN MOSBY,<br>    *Plaintiff*,<br><br>v.<br><br>BOARD OF EDUCATION OF THE CITY<br>OF NORWALK,<br>    *Defendant*. | No. 3:15-cv-01876 (JAM) |

### RULING GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Alvin Mosby worked for many years as a school custodian for defendant Board of Education of the City of Norwalk. He claims that defendant discriminated against him on the basis of his race and has retaliated against him for complaining about discrimination. His principal claim is that a change to the collective bargaining agreement relating to retirement benefits has resulted in a disparate impact on African American employees. I will grant defendant's motion for summary judgment, because I conclude that there is no genuine issue of fact to support any of plaintiff's claims of discrimination or retaliation.

### BACKGROUND

Plaintiff has been employed as a custodian for the Norwalk school system since 1987. Doc. #41 at 3. He is also a member of AFSCME Local 1042, a collective bargaining unit for custodial, maintenance, and security staff employed by the Norwalk Board of Education.[1]

For the entirety of plaintiff's employment with defendant, the Norwalk Municipal Employees Pension Plan has provided that the "normal" retirement date for employees would be

---

[1] Plaintiff has previously litigated claims of racial discrimination against defendant and against his union. *See Mosby v. Norwalk Bd. of Educ.*, 4 F. App'x 15, 16 (2d Cir. 2001); *Mosby v. AFSCME Int'l Union, Council 4 AFSCME AFL-CIO,* 2006 WL 758638, at *1 (D. Conn. 2006).

that employee's sixty-second birthday. *See* Doc. #33-4 at 26; Doc. #41-9 at 18. Employees with at least 10 to 15 years of service time could alternately choose to retire at any point after the age of 55, but those electing such an "early retirement" would receive reduced benefits. *See* Doc. #33-4 at 27; Doc. #41-9 at 18.

Since at least 1997, the provision of health insurance benefits to retired Board of Education custodial, maintenance, and security employees has been governed by a series of collective bargaining agreements (CBAs) between defendant and Local 1042. At different points in time, these CBAs have adopted three different provisions concerning retirement health benefits that are relevant to this case.

The first provision, which was adopted as part of the 1997 CBA and which I will refer to as the 1997 provision, stated that "the Board of Education agrees to maintain upon retirement the existing medical insurance program for the benefit of the employees and their immediate families at no cost to the employees. Employees over sixty-five (65) years of age and protected by Medicare shall be covered in accordance with the terms of the present existing medical insurance plan." Doc. #41-3 at 3. Notably this provision made no distinction between employees who elected an "early" retirement and those who waited until their "normal" retirement date.

The second provision at issue, which I will call the 2003 provision, stated that "employees who retire on or after July 1, 2003 under the terms of the Norwalk Pension Plan and their eligible dependents as of the date of retirement shall continue to be covered until Medicare eligible by the medical insurance plan the Board provides to active employees." Doc. #33-4 at 9. This new contract required that "in order to continue [this] coverage . . . retirees who retire on or after July 1, 2003 and/or their spouses shall pay the same percentage of premium cost that is paid by active employees, as such percentage is amended from time to time." *Ibid*.

2

The 2003 CBA also provided that while "no premium cost share for a Medicare Supplement Plan shall apply to retirees hired before July 1, 2003," those "who were hired by the Board on or after July 1, 2003 and/or their spouses may continue coverage in the Board's Medicare Supplement Plan at their own cost." *Id*. at 10. This provision, in other words, created two classes of retirees: those hired before 2003, who would not have to pay for their Medicare Supplement Plans, and those hired after 2003, who would. Like the 1997 provision, however, it did not distinguish between "early" and "normal" retirees.[2]

The final provision, which I will call the 2013 provision, was adopted by the 2013 CBA, to take effect on June 30, 2016. *See* Doc. #33-3 at 8 (§ 8.03 "Health Insurance Upon Retirement"). It replaced the two-tiered structure of the 2003 provision with a uniform system for all current employees. For the first time, however, it distinguished between employees who would retire at the first possible opportunity and those who would wait longer. Under the 2013 provision, defendant agreed "to pay the full yearly health insurance premium for the employee who retires . . . at age fifty-nine (59) until they reach age sixty-five (65) or are covered under Medicare or Medicaid," and with a 50% premium payment for the employee's spouse. Doc. #33-3 at 8. "Any employee who retired at age fifty-five (55)," however, could only choose to "continue the health insurance at the group rate if he/she pays the full yearly premium and can elect to insure his/her spouse and eligible dependents at the group rate if he/she pays the full

---

[2] It is somewhat unclear from the record exactly how and when the 2003 provision came into effect. It is included in the 2013 CBA; however, that agreement also seems to have *replaced* this 2003 provision with yet a third provision that is discussed below. A "Fact Sheet" prepared for the Local 1042 meeting at which the 2013 agreement was approved also presented the new 2013 CBA as deleting and replacing this provision. Doc. #33-5 at 4–5, 17–18. All this suggests that the 2003 provision was adopted not by the 2013 CBA but by a previous agreement. Most logically, given the substance of the provision, and the distinction it drew between employees hired before or after July 1, 2003, this would have been the 2003 CBA, which is not in the record. I will therefore proceed on the assumption that the terms of this 2003 provision were first adopted in the 2003 CBA. The important thing here is that it was adopted at some point before the 2013 provision.

yearly premium." *Ibid*. In short, the 2013 provision favored "normal" age retirees over "early" retirees in terms of the health insurance premiums that they would have to pay.

Plaintiff filed this *pro se* lawsuit alleging that he is a black male and that the 2013 provision discriminated against him on the basis of his race in violation of Title VII of the Civil Rights Acts of 1964. Doc. #1 at 5.[3] According to plaintiff, the 2013 provision burdened him, because it now made it more costly for him if he chose to take early retirement. Because of its prospective effective date in 2016, the 2013 provision "grandfathered the employees who previous[ly] retired and they were white." *Ibid.* Plaintiff alleges that "white employees who were previously hired and retired prior [to] and after 2003 were not required to pay health and other insurance premiums upon retirement at 55 and not 59." *Ibid.*

Plaintiff additionally alleges that defendant retaliated against him for his prior discrimination complaints. According to plaintiff, defendant retaliated against him by revealing confidential information about his salary and home address to a local blogger and that this humiliated him and intruded upon his privacy. *Ibid.*

Defendant initially moved to dismiss the complaint. I granted the motion to dismiss insofar as plaintiff sought to proceed on a theory of disparate *treatment* under Title VII, because the complaint was devoid of any factual allegations that would support a claim that the amendment to the 2013 CBA was a product of intentional discrimination against plaintiff on the basis of his race. Doc. #25. By contrast, I declined to dismiss plaintiff's claim insofar as he sought to proceed on a theory of disparate *impact* under Title VII and also for retaliation. *Ibid.*[4] Defendant has now moved for summary judgment.

---

[3] Although the complaint also alleges discrimination against plaintiff because of his "sex," Doc. #1 at 5, there has been no argument or evidence to support a claim for discrimination on the basis of plaintiff's male sex.
[4] I granted plaintiff leave to file an amended complaint to allege a claim for disparate treatment if he could allege facts to support a claim of intentional discrimination amounting to disparate treatment. Doc. #27 at 44; Doc. #31 at

## DISCUSSION

The principles governing the Court's review of a motion for summary judgment are well established. Summary judgment may be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). My role at the summary judgment stage is to decide if there are enough facts in dispute to warrant a trial. Of course, I must view the facts in the light most favorable to the party who opposes the motion for summary judgment and then to decide if those facts would be enough—if eventually proved at trial—to allow a jury to decide the case in favor of the opposing party. If the facts do not rise to the level that would allow a reasonable jury to rule in the opposing party's favor, then there is no point in allowing the lawsuit to proceed, and the motion for summary judgment will be granted. *See generally Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (per curiam); *Pollard v. New York Methodist Hosp.*, 861 F.3d 374, 378 (2d Cir. 2017).[5]

Because plaintiff is a *pro se* litigant, his complaint and other filings "must be construed liberally and interpreted to raise the strongest arguments that they suggest." *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013); *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). Plaintiff was otherwise advised of his obligations with respect to opposing defendant's motion

---

1. Plaintiff thereafter filed an amended complaint (Doc. #28) that failed to include any additional facts to support a disparate treatment claim. I entered an order striking the amended complaint on the ground that it did not include additional allegations to support a disparate treatment claim, and I ordered that the operative complaint shall be deemed to be plaintiff's initial complaint. *Ibid.* To the extent that the proposed amended complaint alleges that the 2013 provision amounted to an act of retaliation and not just discrimination, that claim lacks evidentiary support for the same reasons that warrant dismissal of the discrimination claim. No facts plausibly support plaintiff's claim that the entire collective bargaining agreement was amended to disadvantage early retirees for the purpose of retaliating against plaintiff's prior filing of a discrimination claim.

[5] It is true that neither party seeks a trial by jury in this case but the principles governing the Court's review for the sufficiency of evidence to warrant a trial remain the same.

for summary judgment. *See* Doc. #36; *Irby v. New York City Transit Auth.*, 262 F.3d 412 (2d Cir. 2001) (*per curiam*).

### *Disparate Impact*

Title VII of the Civil Rights Act expressly prohibits employers not only from engaging in intentional discrimination but also from using employment practices that cause a disparate impact on the basis of race. *See* 42 U.S.C. § 2000e-2(k). "In contrast to a disparate-treatment case, where a plaintiff must establish that the defendant had a discriminatory intent or motive, a plaintiff bringing a disparate-impact claim challenges practices that have a disproportionately adverse effect on minorities and are otherwise unjustified by a legitimate rationale." *Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct. 2507, 2513 (2015). Thus, as the Supreme Court has explained, "in evaluating a disparate-impact claim, courts focus on the *effects* of an employment practice, determining whether they are unlawful irrespective of motivation or intent." *Young v. United Parcel Serv., Inc.*, 135 S. Ct. 1338, 1345 (2015).

As is typical for the evaluation of discrimination claims under Title VII, a disparate impact claim involves three stages of burden-shifting proof. *See Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147, 160 (2d Cir. 2001) (outlining each stage). At the first stage a courts considers whether a plaintiff has made a *prima facie* case of disparate impact. It is not enough for a plaintiff simply to show suspicious disparity. Instead, a plaintiff must point to a particular employment practice, and then show that it causes a disparate impact on one of the prohibited characteristics under Title VII such as race. *See Lewis v. City of Chicago, Ill*, 560 U.S. 205, 211-213 (2010); *Chin v. Port Authority of New York & New Jersey*, 685 F.3d 135, 152 (2d Cir. 2012).

If a plaintiff makes out a *prima facie* case, then the burden of persuasion shifts to the employer to show one of two things. First, the employer may challenge a plaintiff's statistical proof—to show that there is no statistically significant disparity or that the challenged practice is not the cause of the alleged disparity. *See Robinson*, 267 F.3d at 161.

Alternatively, the employer may show that the challenged practice is "'job related for the position in question and consistent with business necessity.'" *Ibid.* (quoting 42 U.S.C. § 2000e–2(k)(1)(A)(i)). Assuming that the employer shows a business justification, "then the burden of persuasion shifts back to the plaintiffs to establish the availability of an alternative policy or practice that would also satisfy the asserted business necessity, but would do so without producing the disparate effect." *Ibid.*

Defendant argues that there is no "employment practice" at issue here, because the provision challenged by plaintiff was not unilaterally imposed by defendant but was the product of an agreement between defendant and Local 1052. Doc. #33-1 at 11-12. I do not agree. Defendant concedes that it agreed to the provision at issue here, and there is no doubt that its agreement was necessary for the provision to go into effect. Accordingly, defendant is responsible for any discriminatory consequences of this provision, even if defendant happened to act in league with the union. Moreover, Title VII prohibits discrimination not only by employers but also by labor organizations. *See* 42 U.S.C. § 2000e-2(a) & (c). In view that both an employer and a union may be liable for discrimination, it would be senseless to conclude that if they decide to collaborate in a discriminatory act, then neither should be liable, because only the other one is responsible. It is not surprising that defendant cites no authority at all for its contrary argument.

Equally specious is defendant's quite remarkable argument that there could not have been any racial discrimination against plaintiff because the president of the union as well as a majority

of its members were black. Doc. #33-1 at 11, 22. To begin with, this argument ignores that a disparate impact claim does not require a showing of intentional discrimination. Moreover, even assuming discriminatory intent were at issue, defendant's argument focuses only on the race of the members of the *non*-party union, rather than the race of any decisionmakers employed at the defendant Board of Education; plaintiff has sued the Board of Education, not the union.

Lastly, defendant's argument wrongly assumes that persons from one protected class cannot as a matter of law discriminate against persons from the same protected class. *See, e.g., Bryant v. Begin Manage Program*, 281 F. Supp. 2d 561, 570 (E.D.N.Y. 2003). If defendant were right, then employers could easily immunize themselves from discrimination claims merely by stocking their human resources departments with a rainbow coalition of race, religion, and gender, then ensuring that the relevant decisionmaker for each adverse action against an employee matched the employee's own protected class characteristics. To the contrary, Title VII protects against intragroup discrimination—against black-on-black discrimination, woman-on-woman discrimination, Christian-on-Christian discrimination all the same. *See* Enrique Schaerer, *Intragroup Discrimination in the Workplace: The Case for "Race Plus",* 45 Harv. C.R.-C.L. L. Rev. 57 (2010).

The next requirement—that plaintiff demonstrate the existence of a racial disparate impact—is more complicated. Plaintiff's theory of disparate impact is that the 2013 provision of the CBA "grandfathered the employees who previous[ly] retired and they were white." Doc. #1 at 5. But the record contains no evidence of the racial makeup of previously retired employees as of 2013. Although evidence submitted by defendant shows that 54% of active employees in 2013 were African-American, Doc. #33-4 at 5–7, the record does not tell me if the population of retired employees as of 2013 was a higher or lower percentage of African-Americans than this.

Plaintiff has therefore failed to show any disparate impact as between currently employed and previously retired employees.

There is, however, another possible axis along which plaintiff could claim a disparity existed (and I will explore the issue in light of plaintiff's *pro se* status). The 2003 provision included a "grandfather" clause offering more generous Medicare Supplement benefits to employees hired before 2003 than to those hired after 2003. Doc. #33-4 at 10. The 2013 provision contained no such distinction; its less generous terms applied equally to pre- and post-2003 hires. *Ibid.* In fact it appears, though it is not clear, that the 2013 provision altogether eliminated the Medicare Supplement element of the retirement benefits. Because pre-2003 hires had enjoyed especially generous benefits prior to 2013, adopting this new, somewhat stingier benefits package for all employees had a greater marginal adverse effect on those hired before 2003. And the record does contain evidence of the racial break-down of those current employees in 2013 who had been hired before 2003 compared to those hired after 2003. According to the list provided by defendant, 24 of 40 pre-2003 hires were African-American, as were 28 of 56 post-2003 hires. Only 9 pre-2003 hires were white, compared to 24 post-2003 hires. Doc. #33-4 at 5–7. On this view, 60% of the disfavored class, pre-2003 hires, was African-American, compared to just 50% of the favored class. Looking at it another way, about 46% of African-American employees were members of the disfavored class, compared to just 27% of white employees. There is also at least some allusion to this disparity between pre-2003-hirees and post-2003-hirees in plaintiff's filings. *See* Doc. #41 at 3 (¶ 8).

But there's more. The 2013 provision, as noted, went into effect after June 30, 2016, but it was adopted by the 2013 CBA. In his affidavit, Michael Lyons, chairman of the Board of Education, states that this three-year time delay in adopting the new retirement benefits plan was

"done intentionally so that those considering retirement would be able to plan their retirement strategy and thus retire prior to the implementation of these terms in order to avoid any negative consequences from the changes." Doc. #33-3 at 3–4. While thoughtful, this delay actually exacerbates any disparate impact of the new policy. In order to take advantage of the time delay, an employee would need to have been eligible to take early retirement prior to June 30, 2016. Under the terms of the pension plan, an employee was qualified to take early retirement if the employee had 10 years of service and had reached the age of 55. Doc. #33-4 at 17. Every employee hired before 2003 would have at least 10 years of service by June 2016, of course, but not all those employees had reached the age of 55 by that date—only those who were born before June 30, 1961. As it happens, just 14 of the 24 African-American employees hired prior to 2003 were born prior to June 1961, along with four of six such Hispanic employees and seven of nine such white employees. The group of employees who were truly and disproportionately disadvantaged by the 2016 provision, in other words—those hired prior to 2003 but born subsequent to 1961—therefore consists of ten African-Americans, two Hispanics, and two white employees, over a 70% rate of African-Americans compared to just 54% of the entire workforce. All in all, on the strength of the evidence that defendant itself has chosen to submit, I conclude that there is enough of a disparity for purposes of plaintiff's *prima facie* case.

Defendant next argues that plaintiff cannot establish a causal relationship between the policy and any disparity because it cannot be known whether members of the disfavored class would have chosen to take early retirement. Doc. #33-1 at 13–14. This argument misunderstands the causality requirement for a disparate impact claim. The relevant causation inquiry is whether the practice at issue has caused a disparity. *See Lewis*, 560 U.S. at 211-12. What has been shown

so far is that a greater percentage of African Americans are adversely impacted by the 2013 provision: they bear a disproportionate burden from the change in policy in 2013.

The issue of whether any African Americans would actually decide to seek early retirement is a separate consideration from whether the employment practice has caused the disparity in the first place. Defendant's "causation" argument is really a "no harm, no standing" argument—that, for example, if a city were to prevent persons of color from riding the city's buses, then who is to say that anyone of color will ever be harmed, because can we really ever know that people of color will want to ride the bus? I do not agree with defendant's "causation" argument. I think it is a safe assumption that most workers wish to retire one day and to do so on as advantageous terms as possible. If there is disparity, then there is harm. If the 2013 provision indeed has a racially disparate impact, then those impacted should be free *ex ante* to make their retirement choices free from the shroud of disadvantage that is disproportionately imposed on persons of their same race.

In short, I conclude that at least a genuine fact issue remains as to the elements of plaintiff's *prima facie* case for disparate impact liability. This does not end the matter, however, because as noted above an employer can contest a disparate impact claim by showing that the policy or practice at issue is "job related for the position in question and consistent with business necessity." *Robinson*, 267 F. 3d at 161 (2d Cir. 2001) (*quoting* 42 U.S.C. § 2000e-2(k)(1)(A)(i)).

Defendant has indeed advanced a good faith business reason for the 2013 provision: the need to cut costs in the wake of financial hardships from the 2008 "Great Recession" and the bargaining for higher wage increases to be offset by changes in the terms for retiree medical insurance. *See* Doc. #33-1 at 14–15, Doc. #33-3 at 1-2. These seem like good faith reasons to me. Moreover, it is readily understandable why an employer who is looking for cost savings

from retiree benefits would choose to disadvantage those who retire "early" as opposed to those who retire at the "normal" retirement age. Employers have an interest in retaining experienced personnel and inhibiting them within reason from leaving employment.

As defendant has shown a business necessity that justified the 2013 provision in the CBA, the burden shifts back to plaintiff to "establish the availability of an alternative policy or practice that would also satisfy the asserted business necessity, but would do so without producing the disparate effect." *Robinson*, 267 F. 3d at 161. Plaintiff here has entirely failed to meet this burden. He has not established the availability of any alternative policy or practice that would satisfy defendant's concerns. Accordingly, I conclude that there is no genuine issue of fact remaining to support plaintiff's disparate impact claim.

Even if I am mistaken about this conclusion, I conclude on alternative grounds that plaintiff's disparate impact claim must be dismissed. That is because Title VII recognizes that an employment practice that occasions a disparate impact may still be justified if the practice is pursuant to a *bona fide* seniority system. *See* 42 U.S.C. § 2000e-2(h) ("Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona-fide seniority or merit system...provided that such differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin."). Thus, for example, in *Prieto v. City of Miami Beach*, 190 F. Supp. 2d 1340 (S.D. Fla. 2002), a court upheld a two-tier wage policy that favored employees hired before April 1993, notwithstanding a claim that this policy resulted in a racially disparate impact.

Just what is a "*bona fide* seniority system"? Title VII does not say. *See California Brewers Ass'n v. Bryant*, 444 U.S. 598, 605 (1980) (noting absence of statutory definition or

helpful legislative history). The Supreme Court has observed that "in the area of labor relations, 'seniority' is a term that connotes length of employment," and "a 'seniority system' is a scheme that, alone or in tandem with non-'seniority' criteria, allots to employees ever improving employment rights and benefits as their relative lengths of pertinent employment increase." *Id.* at 605-06. Thus, "the principal feature of any and every 'seniority system' is that preferential treatment is dispensed on the basis of some measure of time served in employment." *Id.* at 606.

A classic example of a seniority system is one that allots more employee benefits to those employees who have previously served a longer tenure with the company. The obvious and non-invidiously-discriminatory reason to do so is to reward those who are loyal to the company and who have acquired more and more experience that bespeaks superior ability to perform their jobs.

Here, the employment practice at issue is not a classic seniority system—it does not operate on the basis of the length of *prior* employment with defendant. Instead, the employment practice at issue is one that favors those who commit to a *future* longer term of employment by abstaining from taking an early retirement. The employee who is willing to serve until at least age 59 is treated more favorably than the employee who bails out at age 55. Although the mechanics of this system are different than a classic seniority system, the purposes served are the same: to reward tenure of employment—whether prior or future. And the self-evident benefits to the employer of rewarding and enhancing employee experience are also the same.

True enough, for the reasons discussed earlier in this ruling, it could be argued that the preference that is given here to normal-age retirees over early-age retirees tends to undercut the prior seniority system that had favored employees like plaintiff who had been hired before 2003. But this consideration does not alter the fact that the 2013 provision nonetheless rewards

13

employees on the basis of a prospective measure of future time they will serve in employment. That is the measure under *Bryant* of what is a "seniority system"—a system that operates "on the basis of some measure of time served in employment." 444 U.S. at 606. The fact that the 2013 provision opts for a different manner of rewarding seniority than before and that it operates by measure of *future* anticipated tenure of employment rather than *past* tenure of employment does not mean that the 2013 provision creates something other than a "*bona fide* seniority system."

In addition, when as here a seniority provision is incorporated into a collective bargaining contract, that is yet additional reason to uphold the provision against a Title VII challenge. *See American Tobacco Co. v. Patterson*, 456 U.S. 63, 76 (1982) (noting that "seniority provisions are of overriding importance in collective bargaining" and that "Congress was well aware in 1964 that the overall purpose of Title VII, to eliminate discrimination in employment, inevitably would, on occasion, conflict with the policy favoring minimal supervision by courts and other governmental agencies over the substantive terms of collective-bargaining agreements") (internal quotation marks and citations omitted).

Accordingly, I conclude that an employment practice that prospectively privileges "normal" age retirees over "early" retirees is a qualified "seniority system" within the meaning of Title VII. Because there is no longer a claim of intentional discrimination, it is also a "*bona fide* seniority system" and precludes plaintiff's disparate impact claim.

### *Retaliation*

Plaintiff also advances a retaliation claim, asserting that defendant released his address and salary information to a blogger who then wrote about him. Title VII prohibits employers from discriminating against an employee who has "made a charge . . . or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-

3(a). The Supreme Court has held that Title VII's antiretaliation provision prohibits any employer action that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal quotation marks omitted).

There is no evidence in the record that defendant released plaintiff's confidential information to a blogger as plaintiff claims. Both plaintiff and defendant have provided evidence that the blogger in question did indeed write about plaintiff, including his address and salary information, and I do not doubt that this caused distress to plaintiff. Nonetheless, the evidence that both parties have provided indicates that the blogger obtained this information from publicly available sources and not as a result of any retaliatory measures taken by defendant.

Plaintiff himself has filed evidence reflecting that any disclosure of his private information in blog posts was not because of any disclosure by defendant. In this blog post, the blogger explains that "Mosby's address and salary have been published on this website as part of an annual compilation of the salaries of city employees. . . The list, a public document, is provided to the media by Norwalk Comptroller Frederic Gilden, an employee of the city's Finance Department, not the Board of Education. The media requests this list every year." *See* Doc. # 41-4 at 2.

To the extent that plaintiff attempts to raise new retaliation claims in his papers opposing defendant's motion for summary judgment, those claims have not been properly raised. *See Thomas v. Egan*, 1 Fed. Appx. 52, 54 (2d Cir. 2001) (finding in case involving a *pro se* litigant that "it is inappropriate to raise new claims for the first time in submissions in opposition to a summary judgment motion."). I will therefore grant defendant's motion for summary judgment on plaintiff's retaliation claim.

15

## Conclusion

For the foregoing reasons, defendant's motion for summary judgment (Doc. # 33) is GRANTED. The Clerk of Court shall close this case.

It is so ordered.

Dated at New Haven this 30th day of September, 2017.

                                                  /s/ *Jeffrey Alker Meyer*
                                                Jeffrey Alker Meyer
                                                United States District Judge